UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ JUL 23 2019 ★

BROOKLYN OFFICE

------------------------------------------------------------- X

**DINO SOLORZANO**,

                  Petitioner,

         – against –

**THE PEOPLE OF THE STATE OF NEW YORK** and **ATTORNEY GENERAL ERIC T. SCHNEIDERMAN**,

                  Respondents.

------------------------------------------------------------- X

**MEMORANDUM
DECISION & ORDER**
16-CV-04363 (AMD)

**ANN M. DONNELLY**, United States District Judge:

The *pro se* petitioner, currently incarcerated at Otisville Correctional Facility, petitions

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On March 12, 2009, following a jury

trial in Queens County, New York, the petitioner was convicted of one count of Assault in the

First Degree (N.Y. Penal Law § 120.10[1]), two counts of Assault in the Second Degree (N.Y.

Penal Law §§ 120.05[1, 2]), and one count of Criminal Possession of a Weapon in the Fourth

Degree (N.Y. Penal Law § 265.01[2]). The petitioner claims he was denied due process by the

state court's resettlement of the trial record on the subject of jury notes and whether trial counsel

had the opportunity to weigh in on the court's response. (ECF No. 1-3 at 1.) The petitioner also

asserts that his trial lawyer and his appellate counsel were ineffective. (*Id.*) For the reasons that

follow, the petition for a writ of habeas corpus is denied.

### FACTUAL BACKGROUND[1]

### I. Overview

In the early morning hours of January 29, 2008, the petitioner got into an argument with

---

[1] Because the petitioner was convicted, I summarize the facts in the light most favorable to the verdict. *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).

his father, Domingo Solorzano, and repeatedly hit him in the head and body with a baseball bat, causing serious brain injury. The victim has not regained consciousness and is in a vegetative state.

Uniformed police officers arrested the petitioner, but did not interview him or advise him of his constitutional rights. (ECF No. 8-5 at 430:1-12, 435:19-25.) Later that day, the assigned detective took the petitioner from Central Booking to the 112th Precinct, and advised him of his *Miranda* rights, which the petitioner waived. (*Id.* at 429:23-25, 435:19-25, 453:2-14, 454:6-458:25.) He admitted that he hit his unarmed father in the head with a bat because he thought that his father had abused his mother, Zenelia Solorzano. (*Id.* at 429:23-25, 464:22-469:7.)

The petitioner was charged with one count of Assault in the First Degree (N.Y. Penal Law § 120.10[1]), two counts of Assault in the Second Degree (N.Y. Penal Law §§ 120.05[1, 2]), and one count of Criminal Possession of a Weapon in the Fourth Degree (N.Y. Penal Law § 265.01[2]), a misdemeanor. (ECF No. 8-8 at 920:1-926:5.)

## II. Suppression Hearing

Prior to trial, the petitioner's counsel moved to suppress his statements to detectives. On December 2, 2008, and January 13, 2009, Judicial Hearing Officer Joan O'Dwyer held a combined Huntley/Mapp/Dunaway hearing. (*See* ECF No. 8-3 at 2:1–3.) Detective Schettini and Officer Kenneth Mantone testified for the prosecution. (*Id.* at 2:24-3:5, 29:14-19.)

Officer Mantone, a patrol officer in the 108th Precinct, learned of the assault around 12:00 a.m. on January 19, 2008, and went to 50-28 48th Street in Queens County. (*Id.* at 30:3-31:14.) He asked the petitioner, who was leaning against a parked car, what he was doing; the petitioner responded, "I hit him in the head twice and in the arm twice." (*Id.* at 32:5-24.) Officer Mantone arrested the petitioner, and retrieved the petitioner's bat and vouchered it. (*Id.* at 33:1-

8, 34:10-35:2.)

Detective Schettini was first assigned to the petitioner's case in the afternoon of January 19, 2008, when an assistant district attorney told him about the assault and informed him that the victim might not survive. (*Id.* at 3:20-4:6.) The assistant district attorney asked Detective Schettini to "enhance the case" by questioning the petitioner. (*Id.*) Detective Schettini and his partner, Detective Naqvi, picked the petitioner up from Central Booking, and took him to an interview room in the 112th Precinct Detective Squad. (*Id.* at 4:25-5:15, 6:12-19.) Detective Schettini, joined by Detective Wilkowski from the Queens Homicide Squad, advised the petitioner of his constitutional rights from a form; the petitioner said that he understood his rights and agreed to answer questions. (*Id.* at 6:20-9:17.)[2] Detectives Schettini and Wilkowski asked him questions, wrote down each question, and the petitioner wrote out his answers. (*Id.* at 24:10-25:5.) The petitioner also wrote a statement in which he admitted that he hit his father in the head with a bat because he believed his father was abusing his mother. (*Id.* at 9:15-20, 11:11-13:23, 21:4-24:6.)

The petitioner's lawyer cross-examined Detective Schettini about the petitioner's statements that he "spoke to the police because [he] knew [they would] help [him], where no one else would" and that he did not "have an attorney, nor did [he] ask to have one." (*Id.* at 13:24-14:11.) Counsel established that Detective Schetteni did not know if the petitioner had requested an attorney, spoken to an attorney, or had been advised of his rights before the detective picked him up from Central Booking. (*Id.* at 15:12-16:6.)

The petitioner's lawyer asked the court to suppress the petitioner's statements to the detectives, arguing that the police delayed the petitioner's arraignment when they took him from

---

[2] The petitioner initialed each question and answer, and signed the *Miranda* form. (*Id.* at 7:12-23, 8:8-9:17, 20:3-25.)

3

Central Booking to the precinct to take a statement from him, which counsel claimed violated the petitioner's right to counsel. (*Id.* at 49:6-20.) The judge denied the petitioner's motion to suppress. *See People v. Solorzano,* 94 A.D.3d 1153, 1154 (2d Dep't 2012).

## III.  The Trial

### a.  *The Prosecution's Case*

The prosecution called nine witnesses: Karla Solorzano, Sylvia Solorzano, Chris Catter, Officer Mantone, Officer Jason Wolf, Detective Schettini, Minerva Sanchez, Dr. Hang Byun, and EMT Elis Joseph. The prosecution established the following facts.

On the evening of January 18, 2008, the petitioner was with Chris Catter and Edwin Clavigo near his house in Queens, New York.[3] (ECF No. 8-5 at 384:23-385:25.) At one point, the petitioner's parents, Domingo and Zenalia Solorzano, left their house (*Id.* at 387:1-389:7), and returned about a half hour later; Mrs. Solorzano was now limping and holding on to her husband. (*Id.* at 389:23-390:2, 391:5-25.) The petitioner walked over and demanded, "What did you do to her?" (*Id.* at 392:12-24.) He argued with his father, returned to his friends, and told them that his father hit his mother and "prostituted" her. (*Id.* at 393:8-394:3.) The petitioner then went back to his house. (*Id.* at 394:11-13, 395:9-15.)

Meanwhile, his sister, Karla, and her partner, Minerva Sanchez, were in the basement apartment of the Solorzanos' house. (*Id.* at 489:20-21, 494:6-15.) They heard yelling from the first floor. (*Id.* at 495:15-496:2.) Sanchez heard the petitioner yell, "I have a gun. Do you want to see my gun? I'm going to blast you." (*Id.* at 496:5-9.) Karla went upstairs while Sanchez waited in their apartment. (*Id.* at 497:2-10.) The petitioner yelled that Domingo Solorzano was

---

[3] The petitioner lived with his parents in their home. (ECF No. 8-4 at 278:18-280:14.) The petitioner's sister Karla Solorzano lived in the basement apartment with Minerva Sanchez, and another sister, Sylvia Solorzano lived across the street. (*Id.*)

"beating up," "raping," and "prostituting" their mother. (ECF No. 8-4 at 288:16-25.) Mr. Solorzano ordered the petitioner to leave the house, but the petitioner went into his parents' room, retrieved a bat, and repeatedly hit his father on the head and arms until the older man collapsed. (*Id.* at 289:11-294:25.)

Sanchez heard Karla scream "at the top of her lungs," and ran upstairs, calling 911 on the way up. (ECF No. 8-5 at 497:12-17, 498:2-4.) The petitioner walked past her on his way out of the house. (*Id.* at 498:2-10.) Karla was screaming, and Domingo Solorzano was on the floor; "blood [was] dripping down" a "huge gash" on his head. (*Id.* at 500:4-501:4.) Chris Catter heard a scream, looked through the door, and saw Domingo Solorzano lying on the floor. (*Id.* at 395:15-20.) The petitioner told Catter that he thought he killed his father with a bat, but that "it was self-defense" because his father was hitting his mother. (*Id.* at 396:12-21.) The petitioner did not mention that his father had a weapon. (*Id.* at 396:20-397:1, 408:24-409:1.) At one point, the petitioner tried to come back inside, but Karla pushed back on the door, and he went back outside. (*Id.* at 502:1-503:25.) The petitioner's mother was on the kitchen floor; she had a bruise on her face and was slurring her words. (*Id.* at 505:18-506:18.)

Shortly thereafter, Officer Kenneth Mantone and his partner Officer Jason Wolf responded to Sanchez's 911 call, and saw petitioner leaning on a parked car in front of the house. (*Id.* at 413:23-415:13.) The petitioner, who did not appear to be injured, mumbled that his father was "pimping" his mother, and said, "I hit him twice in the arm and twice in the head." (*Id.* at 416:12-20.) The officers handcuffed the petitioner, and put him in the police car. (*Id.* at 416:21-417:15.)

Meanwhile, Sanchez went across the street, and told Sylvia Solorzano, the petitioner's other sister, that her father was hurt. (*Id.* at 356:16-20.) Sylvia saw her brother in handcuffs, and

yelled, "What the 'F' did you do?" (*Id.* at 357:2-6.) The petitioner responded, "Daddy was prostituting mommy." (*Id.* at 357:7-9.) Sylvia walked in the house and saw her father "vomiting" and "bleeding from his head profusely." (*Id.* at 359:17-25.) Her mother had "an old green bruise on her cheek," which Sylvia had seen earlier that day. (*Id.* at 362:21-363:7.)

When other officers arrived, Officers Mantone and Wolf went into the house and found a "chaotic scene." (*Id.* at 441:14-19.) Mr. Solorzano was "bleeding profusely" from his head, and his daughters were trying to stop the bleeding. (*Id.* at 441:6-19.) The petitioner's mother was "unsteady on her feet" and had watery, bloodshot eyes and alcohol on her breath. (*Id.* at 442:16-21.) She was getting in the way of the paramedics, so Officer Wolf took her to another room. (*Id.* at 443:11-444:5.)

Later that day, an assistant district attorney asked Detective Schettini to investigate the assault. (*Id.* at 450:12-15.) At around 6:00 p.m., he and Detective Naqvi took the petitioner to the 112th Precinct. (*Id.* at 451:6-453:3.) After the detective[4] advised the petitioner of his constitutional rights, the petitioner wrote out a three-page statement in which he described his suspicion that his father was beating his mother. (*Id.* at 457:10-464:25.) He wrote that he "grew confused over the last two years not knowing who is bothering her. Possibly bums or street people, and how finally seeing her on the floor with a mark, [he] decided [to] call [his] sister to call cops, but then [he] felt on her face . . . threatened and blanked out." (*Id.* at 466:19-24.) The petitioner "got thinking" that Mr. Solorzano "could hurt [him] or [his mother]. So, [he] got a bat and one source of abuse would realize that pain is not pleasant. [*sic*] He is 250 pounds. My mom is 115 pounds." (*Id.* at 466:25-467:6.) The petitioner, Detective Wilkowski, and Detective Schettini signed the statement. (*Id.* at 467:7-9.)

---

[4] Detective Wilkowski was also in the room.

6

Detective Schettini then wrote out a series of questions to which the petitioner wrote out answers:

> Question: Did you see your father hit your mother today?
> Answer: I saw a mark that wasn't present five minutes and when him [*sic*] trying to covering it up.
>
> Question: Do you remember how many times you hit your father with a bat?
> Answer: I hit him in the arm, and then he tried getting the bat. So, I hit him and I hit his head once. He fell and hit his head on the tile.
>
> Question: Where did you get the bat from.
> Answer: I found it—I found it in a near hallway.
>
> Question: What was your father doing when you approached him with the bat?
> Answer: He was ready to get a weapon or maybe throw something at me. He was standing.
>
> Question: Did you see your father with a weapon?
> Answer: No, I didn't.

(*Id.* at 467:21-468:16.)

Dr. Hang Byun, a neurosurgeon, treated Domingo Solorzano at Elmhurst General Hospital; Mr. Solorzano's skull and eye socket were fractured, and there were multiple blood clots in his brain. (ECF No. 8-6 at 543:16-24.)[5] He had brain surgery to remove the clots, and additional surgeries over the next few months. (*Id.* at 546:20-551:6.) At the time of the trial in 2009, Mr. Solorzano was in a "vegetative state." (*Id.* at 552:8-12.)

b. *The Defense Case*

Zenelia Solorzano and the petitioner testified for the defense.

Mrs. Solorzano testified that in the years leading up to January 19, 2008, Mr. Solorzano was drinking heavily and frequently subjected her to "sexual abuse." (*Id.* at 584:2-585:4. 588:6-

---

[5] Counsel established on cross-examination that Mr. Solorzano had a blood alcohol content of .16 when he was admitted to the hospital. (*Id.* at 556:2-18.)

14.)[6] On January 19, Mr. Solorzano demanded sex from Mrs. Solorzano, and raped her when she refused. (*Id.* at 590:6-19, 589:20-591:13.) The two started drinking, and eventually left the house to buy more beer. (*Id.* at 592:9-12.) As they headed home, Mr. Solorzano accidentally stepped on his wife's foot, and she started limping. (*Id.* at 592:13-593:14.) The petitioner saw that his mother seemed to be in pain and could not "walk right" (ECF No. 8-7 at 736:8-10), and confronted his father, who "didn't even care in the slightest bit." (*Id.* at 738:6-9.) The petitioner's mother told him to go with his friends, so he left. (ECF No. 8-6 at 594:25-595:5.)

Mrs. Solorzano testified that her husband continued to drink, and when she asked him to stop, he elbowed her in the face, and she fell to the floor. (*Id.* at 595:9-596:25.) At that point, the petitioner walked into the house, and saw his mother on the kitchen floor with a "big mark on her face," and his father laughing. (ECF No. 8-7 at 740:2-19.) The petitioner called to his sister Karla, and told her to call the police because "Daddy's hitting mommy." (*Id.* at 741:14-742:6.) He helped his mother up, and asked his father what he had done. (*Id.* at 597:1-13.) The petitioner's father responded with "vulgar" language, told the petitioner to "[g]et out of here," and threatened to kill him. (*Id.* at 597:16-22.) The petitioner "got scared," and thought his father "was going to go get something," so he retrieved a baseball bat from his parents' room, and returned to the kitchen. (ECF No. 8-7 at 743:16-18.)

Mrs. Solorzano and the petitioner gave different descriptions of what happened next. Mrs. Solorzano claimed that Mr. Solorzano grabbed a large, kitchen knife, and started waving it at her, threatening to "kill anyone." (ECF No. 8-6 at 597:23-599:20.) According to Mrs. Solorzano, her husband threw the knife at the petitioner, who "blocked it." (*Id.* at 605:22-606:1.) Mr. Solorzano tried to grab at the bat, and he and the petitioner struggled "like two wild

---

[6] At the time of the assault, Mr. Solorzano had been unemployed for three months. (*Id.*)

8

animals." (*Id.* at 606:9-25.)

The petitioner did not see a knife, but "was so scared [he] felt like something was thrown at [him]." (Tr. 744:13-15.) He felt his father's "big energy come at" him so he swung the bat. (Tr. 744:18-19.) Mrs. Solorzano turned to put the knife away, and when she turned back, her husband was on the floor, bleeding from his head. (Tr. 606:9-25, 615:24-616:9.)

The petitioner claimed not to remember the details of what happened next, or much of his interactions with the police. (Tr. 744:20-746:18, 752:21-753:1.) He acknowledged writing a statement later that day, but said that he was "in shock." (Tr. 747:3-749:23.)

The EMTs took Mr. Solorzano to the hospital, and Mrs. Solorzano and one of her daughters went by taxi. She wrote out a brief statement because, even though she "didn't have the mind" to do so, a detective insisted. (Tr. 609:3-610:3, 704:4-16.) She wrote, "Never has my husband, Domingo, hit me," and that she "believe[d] that [her] son . . . needs to be evaluated to see if he is using any drugs." (Tr. 629:8-22, 630:23-631:20.)[7] Mrs. Solorzano did not tell the police, the EMTs, the assistant district attorney, or the grand jury that her husband threw a knife or that he had sexually assaulted her. (Tr. 626:2-19, 638:12-20.)[8] In fact, Mrs. Solorzano told the grand jurors that she never saw her husband with a weapon, testimony she characterized as a "mistake" at trial. (Tr. 654:2-20, 710:3-20.)

Mrs. Solorzano testified that she was "divided" between her husband and son, and would "give [her] life" to have her husband healthy and her son out of jail. (Tr. 608:11-12.)

---

[7] Mrs. Solorzano claims that her daughter Karla directed her to include this statement. (Tr. 630:23-631:20.)
[8] She testified that she did not mention these details because no one asked her about them. (See Tr. 641:3-654:20.)

c. *Jury Deliberations and Verdict*

Judge Lewis charged the jury on March 11, 2009. The jury sent three notes on the first day of deliberations. The jury requested "all of the exhibits in evidence," which the court provided. (Tr. 946:5-10.) In a second note, they asked for "the charges in writing," which Judge Lewis told the jury they could not have. (Tr. 946:11-15.)[9] The third note asked for "the elements of the charges again." (Tr. 946:16-17.) Judge Lewis re-read the elements of the charges to the jury. (Tr. 946:18-960:7.) While the record does not reflect that Judge Lewis discussed the notes with counsel, neither lawyer objected to the way the judge handled the notes, nor did they claim not to have seen the notes before Judge Lewis responded to them. The next day, March 12, 2009, the jury found the petitioner guilty of Assault in the First Degree, two counts of Assault in the Second Degree, and Criminal Possession of a Weapon in the Fourth Degree. (Tr. 964:16-967:8.)

d. *Sentence*

On May 21, 2009, Judge Lewis sentenced the petitioner to concurrent determinate prison terms of 12 years on the first degree assault, 6 years on each of the second degree assaults, and 1 year on the misdemeanor weapons possession count; he also imposed concurrent five-year terms of post-release supervision on the three assault counts. (ECF No. 8-8 at Tr. 21:5-24.)

## PROCEDURAL HISTORY

### I.  Direct Appeal and Resettlement of the Record

The petitioner, represented by counsel, appealed his conviction to the Appellate Division, Second Department. (*See* ECF No. 8 at 1-34.) The petitioner claimed that his written statement

---

[9] Under New York law, a court cannot provide jurors with a written copy of the charge unless both sides consent.

was involuntary and should have been suppressed because the detective questioned him "more than 18 hours after his arrest, for the express purpose of 'enhancing' the prosecution's case." He also argued that the trial judge responded to the jury's notes without giving counsel the opportunity to respond, in violation of *People v. O'Rama*, 78 N.Y. 2d 270 (1991). (*Id.* at 22, 27.)

On July 5, 2011, the prosecution asked the court to hold the appeal in abeyance so that the trial judge could consider the prosecution's motion to resettle the record on the question of the judge's handling of the jury's notes. (ECF No. 8-1 at 113.) As part of their application to Judge Lewis, the prosecution included an affirmation from the trial assistant district attorney, in which he described his specific recollection of seeing the notes and discussing them with Judge Lewis and counsel before Judge Lewis responded to them. In addition, the petitioner's trial lawyer submitted the following affirmation:

> I've read the provided transcript sections. Although I don't specifically recall our conversation, it would seem unlikely that we hadn't discussed the note and the Court's response prior thereto, especially given our high level of communication during trial and my policy of reading and commenting thereupon prior to the Court's response.

(ECF No. 8-1 at 102-03.) Finally, Judge Lewis' court clerk affirmed that the judge's "custom and practice" in the 19 years she had worked with him was to show "all jury notes to the attorneys and invit[e] discussion" before he responded to the jury's questions. (*Id.*)

Judge Lewis granted the State's motion to resettle the record "to the extent that the record reflects that the attorneys were shown the notes from the jury, but not any specific dialogue" among the court and the attorneys. (ECF No. 8-1 at 100-03.) Citing the prosecutor's recollection and the statements of defense counsel and the court clerk, Judge Lewis found that resettlement was "appropriate in order to conform the record to the truth." (*Id.* at 102-03.)

The prosecution then filed its response, in which it based its arguments on the resettled

record. The petitioner's appellate lawyer moved to strike all references to the resettlement order, arguing that the resettlement motion was untimely, and that resettlement was not appropriate under the circumstances. (ECF No. 8 at 58-76.)

On April 24, 2012, the Appellate Division unanimously affirmed the petitioner's conviction. *People v. Solorzano*, 94 A.D.3d 1154 (2d Dep't 2012.) The Appellate Division rejected the petitioner's argument that his statements should have been suppressed, concluding that the petitioner's right to counsel had not attached, and there was no evidence that the delay in arraignment was designed to deprive the petitioner of his right to counsel. (ECF No. 8-1 at 3-4.) The court also rejected the petitioner's argument about the trial court's response to the jury's notes as "unpreserved" citing *People v. Starling*, 85 N.Y.3d 509, 516 (1995) (complaint about a jury note is "unpreserved and unreviewable" where trial counsel failed to lodge a contemporaneous objection). (*Id.* at 4.) The Appellate Division also denied the motion to strike the portions of the prosecution's brief that referenced the resettlement order. (*Id.*)

The petitioner's application for leave to appeal to the Court of Appeals was denied on August 8, 2012. *People v. Solorzano*, 19 N.Y.3d 1001 (2012).

## II.     Writ of Error Coram Nobis

The petitioner filed *pro se* a motion for a writ of error coram nobis, arguing that his appellate counsel was ineffective. (*See* ECF No. 8-1 at 24.) The Appellate Division denied the petitioner's motion on October 30, 2013, finding that the petitioner "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Solorzano*, 110 A.D.3d 1107 (2d Dep't 2013). On January 17, 2014, the Court of Appeals denied the petitioner's *pro se* motion for leave to appeal. *People v. Solorzano*, 22 N.Y.3d 1091 (2014).

## III. 440.10 Motion

The petitioner moved before Judge Lewis to set aside his conviction pursuant to C.P.L. § 440.10, arguing that his trial counsel was ineffective, and that Judge Lewis should not have granted the prosecution's motion to resettle the record without a hearing. (ECF No. 8-1 at 70-82.) The petitioner claimed he had new evidence in the form of a letter from his trial attorney stating that he did not have a specific recollection of a discussion about the jury notes. (ECF No. 8-1 at 68-69.) The petitioner also argued that his statements should have been suppressed because they were taken in violation of his constitutional rights. (*Id.* at 83-86.)

In a written decision dated January 15, 2016, and issued *nunc pro tunc* to December 8, 2015, Judge Lewis denied the motion. (ECF No. 8-1 at 160-64.) Judge Lewis found that the petitioner failed to establish that his trial counsel was ineffective; the court held that counsel "clearly demonstrated that he was familiar with and able to employ the basic princip[les] of criminal law and procedure," and in any event, the alleged errors were not so serious that they constituted a violation of the right to counsel, or that the petitioner was prejudiced "in light of the overwhelming evidence against him." (*Id.* 162.) The court rejected the petitioner's suppression claim because evidence about the claim was "all on the record" and could have been raised on direct appeal. (*Id.* at 163.) Judge Lewis also rejected the petitioner's challenge to the resettlement order because the Appellate Division had already decided the issue. (*Id.*)

The Appellate Division denied the petitioner's application for leave to appeal on March 11, 2016. (ECF No. 8-2 at 6.) On June 8, 2016, the Court of Appeals denied the petitioner's application for leave to appeal. (ECF No. 8-2 at 7.)

## IV. Habeas Petition

The petitioner claims that his trial and appellate lawyers were ineffective, and that the

trial court's resettlement decision denied him due process.

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits. 28 U.S.C. § 2254(a). The federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412-13. The court reviews the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A petitioner can seek federal habeas corpus relief only after he exhausts state court remedies, and gives the state courts a fair and full opportunity to review the merits of the

claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

## DISCUSSION

### I.   Evidentiary Hearings

The petitioner argues that he was denied due process when Judge Lewis granted the prosecution's motion to resettle the record without a hearing. (ECF No. 1 at 7; ECF No. 1-3 at 14-16.) He also claims that he was entitled to an evidentiary hearing on his C.P.L. § 440.10 claim that he had newly discovered evidence on the resettlement issue. (ECF No. 1-3 at 18, 24.)

These claims are not cognizable in a federal habeas proceeding. *Corchado v. Rabideau*, 576 F. Supp. 2d 433, 443 (W.D.N.Y. 2008) ("[F]ederal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings." (internal quotation marks and citations omitted)). The petitioner does not cite, and the Court has not found, any federal case that requires a state court to conduct an evidentiary hearing when a party requests resettlement of the record. *See Ciochenda v. Artus*, No. 06-CV-5057, 2009 WL 1026018, at *6 (S.D.N.Y. Apr. 9, 2009).

Nor does the state court's decision not to hold an evidentiary hearing on the petitioner's 440.10 motion warrant habeas relief. Under New York's Criminal Procedure Law, state courts may deny a C.P.L. § 440.10 motion on the merits without a hearing if "[t]he moving papers do not allege any ground constituting legal basis for the motion." C.P.L. § 440.30(4)(a). "Whether or not to hold a hearing on a motion to vacate judgment upon the ground of newly discovered evidence is discretionary with the court to which the motion is addressed." *People v.*

*Crimmins*, 343 N.E.2d 719 (N.Y. Ct. App. 1975), *overruled on other grounds by People v. Jones*, 26 N.E.3d 754 (N.Y. Ct. App. 2014) (citations omitted). A hearing is not required "where the court is able to reach its conclusion on the papers alone," because to do so "would serve no end of justice but would only protract futile litigation." *Id.* (citations omitted). In this case, Judge Lewis reached a determination on the papers alone, which "was proper under New York State law, and did not did not violate clearly established Supreme Court precedent or Federal law." *Rustici v. Philips*, 497 F. Supp. 2d 452, 469 (E.D.N.Y. 2007), *aff'd sub nom. Rustici v. Phillips*, 308 F. App'x 467 (2d Cir. 2009).

## II. Resettlement of the Record

The petitioner also challenges the way Judge Lewis addressed the jury's notes, and argues that his decision to resettle the record violated his constitutional rights. (ECF No. 1 at 6-7; ECF No. 1-3 at 14-16, 21.)

The petitioner's claim about Judge Lewis' response to the jury's notes is procedurally barred; because his attorney registered no objections to the procedure, the Appellate Division held that the petitioner's argument was "unpreserved." *See Butler v. Cunningham*, 313 F. App'x 400, 401 (2d Cir. 2009) ("The New York court's finding that [the petitioner]'s claim was unpreserved for appellate review is an independent and adequate state ground that bars a federal court from granting habeas relief."); *Williams v. Artus*, 691 F. Supp. 2d 515, 524 (S.D.N.Y. 2010) ("The Court of Appeals for the Second Circuit has acknowledged that New York's contemporaneous objection rule . . . is a firmly established, independent, and adequate state ground that bars habeas review of the merits of a constitutional claim."). Nor has the petitioner shown "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[d] that failure to consider the claims will result in a fundamental

16

miscarriage of justice." *Azaz v. Artus*, No. 09-CV-3857, 2011 WL 9368971, at \*8 (E.D.N.Y. Nov. 2, 2011), *report and recommendation adopted*, No. 09-CV-03857, 2012 WL 5289519 (E.D.N.Y. Oct. 19, 2012); *see also Powell v. Graham*, No. 10-CV-1961, 2013 WL 37565, at \*8 (E.D.N.Y. Jan. 3, 2013) (same); *Severino v. Phillips*, No. 05-CV-475, 2008 WL 4067421, at \*8 (S.D.N.Y. Aug. 25, 2008) (same).

Moreover, the petitioner's claims are premised on alleged violation of New York's laws—the handling of the jury's notes pursuant to C.P.L. § 310.30 and whether to grant a motion to resettle the record. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991); *see also Cornado v. Bellnier,* No. 10-CV-5265, 2012 WL 6644637, at \*5-6 (S.D.N.Y. Sept. 20, 2012) ("A claim premised on a violation of [C.P.L. §] 310.30 does not allege a violation of a federally protected right."). Accordingly, the plaintiff's claim is not cognizable upon federal habeas review. In any event, the trial judge's factual determination—that the prosecutor's affirmation and the statements of defense counsel and the court clerk provided sufficient reason to resettle the record—is presumed to be correct, and the petitioner has not satisfied his burden of rebutting that presumption by clear and convincing evidence. *See Williams v. Artus*, No. 05-CV-2479, 2006 WL 3694549, at \*6 (E.D.N.Y. Dec. 13, 2006) (rejecting claim that trial court erred by resettling the record without conducting an evidentiary hearing because petitioner failed to rebut presumption of correctness with clear and convincing evidence).

## III.    Ineffective Assistance of Trial Counsel

The petitioner argues that his trial lawyer was ineffective in two respects: (1) by failing to argue that the detectives advised him of his rights only after securing a confession, in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Missouri v. Seibert*, 542 U.S. 600 (2004), and (2)

by not objecting to what the petitioner claims were errors in the trial court's response to the jury's notes. (ECF No. 1 at 8; ECF No. 1-3 at 32.)

The petitioner raised both of these claims in his § 440.10 motion. (ECF No. 9-3 at 118-32.) Judge Lewis rejected his claims about counsel's failure to make certain arguments at the suppression hearing and to object to the court's response to the jury's note since sufficient facts appeared on the record so that the issues could have been raised on direct appeal. (ECF No. 8-1 at 162-63.) The court held that the petitioner could have raised these claims on direct appeal, "but unjustifiably failed to do so." (*Id.* at 163.) Thus, these claims are procedurally barred from habeas review. *Yampierre v. Phillips*, No. 05-CV-2249, 2010 WL 744526, at *5 (E.D.N.Y. Mar. 1, 2010) ("§ 440.10(2)(c) is a 'firmly established and regularly followed' state procedural rule that can serve as an adequate bar to merits review of a claim of ineffective assistance of trial counsel." (internal quotation marks and citation omitted)).

Citing *Strickland v. Washington*, 466 U.S. 668 (1984), Judge Lewis rejected the petitioner's ineffective assistance claim, finding that trial counsel "clearly demonstrated that he was familiar with and able to employ all the basic princip[les] of criminal law and procedure." (ECF No. 8-1 at 162.) Moreover, the court held that the petitioner failed to show that the alleged errors were so serious that the petitioner was denied his Sixth Amendment right to counsel, or that there was prejudice "in light of the overwhelming evidence against him." (*Id.*)

In order to prevail in this Court, the petitioner must show that Judge Lewis' decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

*Strickland v. Washington* governs claims of ineffective assistance of counsel. The

Supreme Court has advised that the relevant inquiry—whether the state court's determination that counsel rendered effective assistance was an unreasonable application of clearly established law—is "different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington*, 562 U.S. at 101. A state court must be granted a "deference and latitude that are not in operation when the case involves a review under the *Strickland* standard itself." *Id.* A federal court "must determine what arguments or theories supported, or . . . could have supported, the state court's decision," and must then determine "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* at 102. The standard was "meant" to be an exacting one; a state habeas petitioner must demonstrate that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 102-03.

Of course, the *Strickland* standard is high, and requires that a petitioner challenging his attorney's performance overcome the "strong presumption" that counsel's performance fell within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Because a claim of ineffective assistance "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, . . . the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington*, 562 U.S. at 105 (citations omitted).

Thus, an evaluation of counsel's performance is "highly deferential," and the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The relevant inquiry focuses "on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696. The

"central concern is not with grading counsel's performance but with discerning whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *United States v. Aguirre,* 912 F.2d 555, 560 (2d Cir. 1990) (internal quotations and citation omitted).

Under *Strickland,* the petitioner must establish that his counsel's performance was "so deficient that, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.'" *Gonzalez v. United States,* 722 F.3d 118, 130 (2d Cir. 2013) (quoting *Strickland,* 466 U.S. at 690). A habeas court must "strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, a presumption that is overcome only through a showing that counsel failed to act reasonably considering all of the circumstances." *Jackson,* 763 F.3d at 152 (internal quotation marks and citations omitted).

The petitioner must also establish that his counsel's "deficient performance prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 687, 694. "A reasonable probability is one that is sufficient to undermine confidence in the outcome, which requires a substantial, not just conceivable, likelihood of a different result." *Jackson,* 763 F.3d at 153 (internal quotation marks and citation omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington v. Richter,* 562 U.S. 86, 104 (2011).

    a. *First* Strickland *Prong: Reasonableness*

The petitioner has not established that his trial counsel's representation fell below an

objective standard of reasonableness. As Judge Lewis noted, the petitioner's lawyer demonstrated at trial that "he was familiar with and able to employ all the basic princip[les] of criminal law and procedure." (ECF No. 8-1 at 162.) Indeed, a review of the trial record demonstrates that counsel was a zealous advocate who pursued a reasonable, if ultimately unsuccessful, strategy.

Counsel's arguments at the suppression hearing—that detectives delayed his arraignment to violate his right to counsel—were reasonable under the circumstances of the case. Contrary to the petitioner's claims, there was no evidence that the detectives waited to advise the petitioner of his right until after he confessed. Because the record does not support a *Seibert* Claim, counsel could not have been ineffective for failing to make one. *See, e.g., Duncan v. Fischer,* 410 F. Supp. 2d 101, 110 (E.D.N.Y. 2006) (*Missouri v. Seibert* is not applicable where "[t]here is no indication that the police . . . adopted any strategy to avoid *Miranda.*").

Equally unavailing is the petitioner's argument that his counsel was ineffective because he did not object to the claimed "mode of proceeding error"—the judge's response to the jury's note. "New York courts find a mode of proceedings error in this situation only where counsel is not given meaningful notice and an opportunity to object." *Pitre v. Griffin,* No. 16-CV-6258, 2016 WL 7442653, at *6 (E.D.N.Y. Dec. 26, 2016). The record, as resettled by the trial judge, establishes that there was no error, and that Judge Lewis discussed the jury notes with the parties before responding to the jury. Since there was no error, counsel could not have been ineffective for failing to object on that basis.

b. *Second* Strickland *Prong: Prejudice*

Even if counsel had been ineffective, there was no prejudice. The evidence against the petitioner was powerful: witnesses saw him attack his unarmed father, an attack he admitted to

21

the police, and which the jury found was not justified. There is no probability that the jury would have acquitted the petitioner had his lawyer utilized a different strategy.

* * *

Accordingly, Judge Lewis' decision was neither contrary to nor an unreasonable application of clearly established Supreme Court law. The petitioner's request for *habeas* relief on this basis is therefore denied.

## IV.    Ineffective Assistance of Appellate Counsel

The petitioner also faults his appellate lawyer for mishanding the resettlement claim; the petitioner says counsel should have argued that detectives denied the petitioner his right to counsel. (ECF No. 1 at 9-10; ECF No. 1-3 at 33-37.)

The petitioner made the same claims to the Appellate Division in a motion for writ of error corum nobis. The Appellate Division denied the motion on the merits, finding that the petitioner "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Solorzano*, 110 A.D.3d 1107 (2d Dep't 2013) (citing *Jones v. Barnes*, 463 U.S. 745 (1983); *People v. Stultz*, 2 N.Y.3d 277 (2004)). Thus, in this proceeding, the petitioner must show that the Appellate Division's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

### a.  *First* Strickland *Prong:  Reasonableness*

#### i.    *Resettlement of the Record*

The petitioner argues that appellate counsel "acted egregiously when he failed to object to the untimeliness of the prosecution's CPLR 5525 motion;" he asserts that his appellate lawyer agreed to the State's request for a C.P.L.R. § 5525 resettlement of the record, and permitted the

22

prosecution to circumvent the proper appellate procedure. (ECF No. 1 at 9-10; ECF No. 1-3 at 35.) He says that counsel should have demanded an evidentiary hearing on the resettlement motion. (ECF No. 1-3 at 37.)

In fact, appellate counsel did object to the resettlement motion, both before Judge Lewis and in the Appellate Division. Counsel argued that resettlement was not appropriate under the circumstances, that the trial court was not the appropriate court for the motion, and urged the Appellate Division to strike the portion of the State's brief that was based on the resettled record. Counsel also moved for leave to appeal the Appellate Division's denial of his motion to strike. Finally, appellate counsel cannot be faulted for the court's decision to grant the motion without a hearing.

### ii. *Right to Counsel*

The petitioner also argues that his appellate counsel should have argued that the detectives questioned him after his right to counsel attached. (ECF No. 1-3 at 33-34.) This argument is meritless.

In New York, "the right to counsel attaches, of course, once the criminal action has been commenced . . . or earlier if there has been significant judicial activity." *People v. Samuels*, 49 N.Y.2d 218, 221 (1980). The filing of a felony complaint commences a criminal action. *Id.* The petitioner argues that the felony complaint was filed before he made his written statements, but the record does not include any evidence to support that claim. Appellate counsel could not have been ineffective for failing to make that argument. *Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1993) (applying *Strickland* to ineffective assistance of appellate counsel claims).

What counsel did argue was that the police deliberately delayed the petitioner's arraignment to take a statement from him, which can in certain circumstances violate New York's right to counsel rules. The Appellate Division rejected the petitioner's arguments,

finding that the petitioner's right to counsel had not attached, and there was no evidence that the delay was designed to deprive the petitioner of his right to counsel and obtain an involuntary confession.

      b. *Second* Strickland *Prong: Prejudice*

Because counsel was not ineffective, there was no prejudice. Accordingly, the Appellate Division's decision was neither contrary to nor an unreasonable application of clearly established Supreme Court law. The petitioner's request for habeas relief on this basis is therefore denied.

### CONCLUSION

The petition for writ of habeas corpus is denied in its entirety. The case is dismissed. A certificate of appealability will not be issued. *See* 28 U.S.C. § 2253(c).

**SO ORDERED.**

                                  s/Ann M. Donnelly
                                  Ann M. Donnelly
                                  United States District Judge

Dated: Brooklyn, New York
      July 22, 2019